

DA 13-0544

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 211

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

TIMOTHY JONATHAN CARTER,

       Defendant and Appellant.

APPEAL FROM:     District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 07-523
Honorable Edward P. McLean, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Kathryn McEnery, McEnery Law Office, PLLC, Kalispell, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Micheal S. Wellenstein, Assistant Attorney General, Helena, Montana

          Fred Van Valkenburg, Missoula County Attorney, Shawn Patrick Thomas, Deputy County Attorney, Missoula, Montana

Submitted on Briefs:   June 11, 2014
Decided:   August 5, 2014

Filed:

_____
Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Timothy Carter appeals from the decision of the Fourth Judicial District Court, Missoula County, revoking his suspended sentence. We affirm.

¶2 Carter articulates three issues in his opening brief, but withdraws one of those issues in his reply brief. We have determined that the dispositive issue on appeal may be stated as follows: Was the District Court's decision to revoke Carter's suspended sentence supported by a preponderance of the evidence?

## BACKGROUND

¶3 On March 19, 2008, Carter entered pleas of nolo contendere to five offenses committed in December 2007: theft (felony), criminal possession of dangerous drugs (felony), partner or family member assault (misdemeanor), assault (misdemeanor), and driving while license suspended or revoked (misdemeanor). On the theft offense, the District Court sentenced Carter to Montana State Prison for ten years, with five years suspended. The court imposed concurrent sentences of five years or less on the other four offenses.

¶4 The District Court also imposed a number of sentencing conditions. Of relevance to this appeal, the court ordered as follows:

> Defendant shall attend AA/NA [Alcoholics Anonymous/Narcotics Anonymous] or other self-help group at the discretion of his Probation/Parole Officer.
>
> .  .  .
>
> Defendant shall not possess or use illegal drugs or any drugs unless prescribed by a licensed physician. Defendant shall not be in control of or

2

under the influence of illegal drugs. Defendant shall not possess drug paraphernalia.

. . .

The Defendant shall obtain a chemical dependency evaluation by a state approved treatment provider/facility, at his own expense, and follow all recommendations of said evaluation.

¶5 Carter served the incarcerated portion of his sentences out of state, in Utah State Prison. He was released on December 12, 2012, and signed up for supervision with Probation and Parole Officer Tim Meloy on December 14, 2012. Meloy's office was in Deer Lodge, Montana. Carter resided with his mother in Ovando, Montana, roughly 75 miles from Deer Lodge. In addition to December 14, Carter reported to Meloy on December 31, 2012, January 14, 2013, February 12, 2013, and March 1, 2013.

¶6 At each of their visits, Meloy gave Carter a urine analysis (UA). All of the tests came back positive for tetrahydrocannabinol (THC), the active ingredient in marijuana. Additionally, the January 14 and March 1 tests detected the presence of amphetamine and methamphetamine in Carter's urine.

¶7 At the December 14, 2012 visit, Meloy instructed Carter to obtain a chemical dependency evaluation. Meloy repeated this instruction at each subsequent visit, and Carter recognized there was "some urgency" in obtaining the evaluation. However, although he attended an initial enrollment session on March 1, 2013, Carter ultimately failed to complete the chemical dependency evaluation. Meloy also instructed Carter repeatedly to attend AA/NA meetings on a weekly basis; however, Carter attended only one AA/NA meeting during the first three months of his probation.

3

¶8    The State filed a petition to revoke Carter's suspended sentence on March 25, 2013. The State alleged that Carter had violated the terms of his probation by possessing or using illegal drugs, by failing to attend weekly AA/NA meetings, and by failing to obtain a chemical dependency evaluation.

¶9    At the two-day revocation hearing held in June 2013, Carter testified that he had smoked marijuana three or four times a day during his incarceration in Utah, beginning in October 2012 and continuing until his release in December 2012. Carter stated he had not ingested any marijuana since his release. Sarah Braseth, a forensic toxicologist with the Montana State Crime Lab, testified that THC can build up in a user's body and, depending on factors such as dose, frequency of use, and duration of use, can show up as a positive result on a urine test "a month or longer" after the person has stopped ingesting the drug. Consequently, Braseth testified, it was possible that the THC detected in the five UAs given to Carter was a "residual effect" from his alleged use of marijuana while in Utah State Prison. Braseth indicated that an "extended detection time"—in particular, Carter's positive test on March 1, 2013, two-and-a-half months after he claimed he had ceased using marijuana—was "rare," but nevertheless possible.

¶10   The District Court judge asked Braseth whether a similar residual effect applied to amphetamine and methamphetamine, which had been detected in Carter's January 14 and March 1, 2013 UA tests. Braseth testified that "if it was a one-time use, I would expect not to find [amphetamine or methamphetamine] in the urine after three days." Carter had not claimed using amphetamine or methamphetamine prior to his release from prison in Utah; to the contrary, he expressly denied ingesting such drugs. Furthermore, Braseth

4

testified that none of the prescription medications Carter was taking would have produced a positive result for amphetamine or methamphetamine in his urine. Thus, Braseth's conclusion was that Carter had been using "street meth" while on probation.

¶11 Regarding his failure to attend weekly AA/NA meetings and his failure to obtain a chemical dependency evaluation, Carter testified that his limited financial means and difficulty arranging for transportation were the reasons for his noncompliance with these conditions. Additionally, he asserted that he had not been given notice that he was required to complete the chemical dependency evaluation within any specific timeframe.

¶12 The District Court found that Carter had violated the terms and conditions of his probationary sentence. The court revoked the theft sentence and sentenced Carter to five years at Montana State Prison, with no time suspended. Carter now appeals.

## STANDARDS OF REVIEW

¶13 We review a district court's determination to revoke a suspended sentence for an abuse of discretion and whether the court's decision was supported by a preponderance of the evidence in favor of the State. *State v. Burch*, 2008 MT 118, ¶ 33, 342 Mont. 499, 182 P.3d 66; § 46-18-203(6)(a), MCA.

## DISCUSSION

¶14 *Whether the District Court's decision to revoke Carter's suspended sentence was supported by a preponderance of the evidence.*

¶15 Carter contends that the State produced insufficient evidence to support a finding that he used marijuana during his probation. Additionally, Carter asserts that the District Court abused its discretion to the extent the court revoked his sentence based on his

failure to attend AA/NA meetings and to obtain a chemical dependency evaluation. He claims that attending regular AA/NA meetings was difficult due to "logistical hurdles," and that he made attempts to obtain a chemical dependency evaluation but was unable to complete the process due to financial difficulties. He argues that he did not violate these conditions of his sentence but "simply needed more time" to complete them. Finally, Carter takes issue with the District Court's reasoning that he needed to complete the chemical dependency evaluation before he could comply with other conditions of his sentence—in particular, the condition requiring him to enter and remain in an aftercare program. Carter contends that his completion of the evaluation was not a prerequisite to entering an aftercare program, that he was not given notice that the terms of his sentence had to be completed in a particular sequence or by a certain date, and that the District Court therefore should have dismissed the alleged violation of the condition requiring him to obtain a chemical dependency evaluation.

¶16 We need not, and do not, address any of the foregoing arguments. As the State correctly points out, a single violation of the terms and conditions of a suspended sentence is sufficient to support a district court's revocation of that sentence. *State v. Rudolph*, 2005 MT 41, ¶ 13, 326 Mont. 132, 107 P.3d 496, *overruled on other grounds*, *State v. Tirey*, 2010 MT 283A, ¶ 27, 358 Mont. 510, 247 P.3d 701. Here, the two UA tests which detected the presence of amphetamine and methamphetamine in Carter's urine, the fact that he was not taking any medication that would have produced the positive results, and Braseth's testimony that amphetamine and methamphetamine do not linger in an occasional user's body for more than three days constituted sufficient

6

evidence upon which the District Court could find, by a preponderance of the evidence, that Carter violated the condition of his sentence prohibiting him from possessing or using illegal drugs. Section 46-18-203(6)(a)(i), MCA.

¶17 Carter nevertheless argues that, in order to find a violation of the no-drugs condition, the State had to prove that his urine tested "positive" as this term is defined in the Probation & Parole Bureau Standard Operating Procedures adopted by the Department of Corrections (DOC). According to Procedure No. P&P 160-1, which is titled "Standardized Offender Urinalysis Screening," a sample is considered "positive" when an initial screen or confirmative screen "show[s] a presence of a controlled or prohibited substance meeting or exceeding the cut-off level" defined elsewhere in the policy. The cut-off level for amphetamines is 300 nanograms per milliliter, and the cut-off for methamphetamines is 1,000 nanograms per milliliter. Carter observes that the amounts of amphetamine and methamphetamine in the January 14 and March 1, 2013 tests were not specified in the toxicology reports. He thus maintains that the State failed to prove that the tests came back "positive" for these drugs.

¶18 The State urges us to reject Carter's reliance on the DOC's cut-off levels. The State observes that, under Carter's argument, a probationer could "freely use drugs while on probation as long as the State falls short of detecting certain amounts of the drugs in his system." The State also cites the testimony of Probation and Parole Officer Andrea Bethel at the revocation hearing. Bethel explained that the cut-off levels listed in DOC's procedural manual are the minimum drug concentrations for which the testing device will guarantee a positive test result. Bethel testified that even if a test result comes back

below the cut-off level, it may still be considered by the Probation and Parole Bureau to be a drug-use violation.

¶19 We need not resolve the parties' dispute regarding the proper interpretation of DOC's cut-off levels. We agree with the State's further argument that, regardless of how DOC's policy is interpreted, the fact remains that Carter was prohibited from using illegal drugs as a condition of his suspended sentence. The sentencing condition did not require a certain threshold amount of illegal drugs in Carter's system before the District Court could find a violation of the condition. The condition stated: "Defendant shall not possess or use illegal drugs or any drugs unless prescribed by a licensed physician. Defendant shall not be in control of or under the influence of illegal drugs. . . ." The toxicology reports on two of Carter's UA tests indicate that amphetamine and methamphetamine were "detected in [his] urine." This, together with the testimony at the revocation hearing, establishes that Carter used illegal drugs while on probation in violation of the foregoing sentencing condition. This was a sufficient basis, by itself, for revoking his suspended sentence.

## CONCLUSION

¶20 The District Court's decision to revoke Carter's suspended sentence was supported by a preponderance of the evidence, and the District Court did not abuse its discretion in revoking the sentence.

¶21 Affirmed.

/S/ LAURIE McKINNON

8

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ JAMES JEREMIAH SHEA